We'll hear argument this morning in Case 15-797, Moore v. Texas. Mr. Sloan? Mr. Chief Justice, and may it please the Court, in Atkins v. Virginia, this Court held that the Eighth Amendment prohibits executing people who are intellectually disabled. And in Hall v. Florida, this Court reiterated that the inquiry into whether somebody is intellectually disabled for that important Eighth Amendment purpose should be informed by the medical community's diagnostic framework and by clinical standards. Texas has adopted a unique approach to intellectual disability in capital cases, in which it prohibits the use of current medical standards, it relies on harmful and inappropriate lay stereotypes, including the so-called Briseno factors, it uses an extraordinary, virtually insuperable, and clinically unwarranted causation requirement, and most fundamentally, it challenges and disagrees with this Court's core holding in Atkins, namely that the entire category of the intellectually disabled, every person who is intellectually disabled, is exempt from execution under the Eighth Amendment. I think your question presented, though, focused only on one, which is that it prohibits the use of current medical standards and requires outdated medical standards. And I think several of the other points you made are not encompassed within that question presented. And maybe there are questions that should be looked at, but they don't seem to be covered by that. I mean, in what you mentioned the correspondence with clinical practices. Has that changed? Did Texas similarly depart from clinical practices under the old standard as it is under the new? It did. The prohibition on the use of current medical standards aggravates and exacerbates that. But if I could address Your Honor's question about the question presented, because I'd like to make two points with regard to that, Your Honor, which is that first of all, it is woven into the Texas Court of Criminal Appeals decision and the judgment that is before the Court, because the Texas Court grounded its determination on the prohibition of consulting and using current medical standards on its Bresenio opinion and Bresenio framework. And the Court said what we decided in Bresenio in 2004, that framework governs, including the clinical standards at the time, but also its view that medical standards generally are exceedingly subjective. That was very important to the Court in its determination here. It's at 6A of the Petition Appendix. Kennedy. I have the same question as the Chief Justice. It just seems to me the question presented doesn't cut to the heart of the case as you describe it. My understanding of your argument, and again I don't think it's wholly reflective of that question, is that whether you use the most current or even slightly older medical standards, there's still a conflict. Am I right about that, that that's your theory? Yes, Your Honor. And if I could add one point, though. It is that the current clinical standards accentuate the conflict, make it even more clear. And what has happened with the current ---- But we wouldn't need that, would we, Mr. Sloan? We could say that the Brisenos standards are in conflict with the old Atkins standards, as well as the new ones. There wouldn't need to be a difference between the old ones and the new ones for you to win this case. That's correct, Your Honor. But you got in the door by a question presented that is a little more eye-catching, which is that they prohibit the current standards and rely on the outdated one. And that's all it says. And I'm just wondering if you got yourself in the door with a dramatic question presented and are now going back to a concern that was just as present, as I understand your argument, under the old standards. Two points on that, Your Honor. First, again, as I was saying, it is woven into the Court of Criminal Appeals decision. One cannot look at their judgment on the prohibition of the use of current medical standards without looking at the framework in which they grounded it. But secondly, Your Honor ---- I'm sorry to interrupt, Mr. Sloan, but could I just make sure I understand that? Because what you're essentially saying is that the Court of Appeals said you are barred from using new standards. You must use the Brisenos standards. So the two are flip sides of the same coin. And what the holding was is you must use Brisenos standards. Now, your QP reflected their framing of the issue. You can't use new standards. You must use the Brisenos standards. But you were just reflecting their essential holding, which is we have this Brisenos case and you have to use it. That's exactly right, Your Honor. Well, then why didn't you say that? I mean, really, the question presented talks about a comparison between current and outdated. And it seemed it's pretty dramatic to say you can't use current standards, you're only using outdated. It's quite a different question as, you know, they use the Brisenos standards and they shouldn't. You don't think they should have used the Brisenos standards under the old medical standards, do you? No, that's correct. But I think, Your Honor, first of all, the question presented, we absolutely stand by it, because they have prohibited the use of current medical standards and instead they have required the use of the 1992 standard. Well, let me ask you the same question in different terms. And you can tell me whether this is not a fair paraphrase of your question. And if you can give me a yes or no answer to this question, I'd appreciate it. Under Holland-Atkins, must a State use current medical standards, for example, DSM-5, as opposed to older standards, for example, DSM-4? Yes or no? No with that wording, Your Honor. Then I don't know how you can recover on the question. You can prevail on the question that you presented to us. Because, Your Honor, the question presented talks about prohibiting.  Well, I don't understand what you mean by prohibit. You mean prohibit the lower courts from using a standard different from the one that the Court of Criminal Appeals has said is the standard that has to be used everywhere in Texas? So each trial-level judge would apply a different standard, whatever that judge thinks is the right one? And that the Court said prospectively the law of Texas is that you're prohibited from using the current medical standards. You think that this is a question of trial court discretion? A trial court has the discretion to use the newer standards as opposed to the standards that the Court of Criminal Appeals says are the appropriate ones? No, I don't think it's discretion. I think the Court has prohibited. The Court said that the State habeas trial court erred by employing the current standards. That's the language the Court used. As opposed to the ones that the Court of Criminal Appeals had itself adopted. From 1992. And so it's helpful to consider, if the Court of Criminal Appeals' decision stands, how Mr. Sloan, to cut to the chase of the underlying question, was the Criminal Court of Appeals using any clinical standard, old medical clinical standard? No, Your Honor. Mr. Sloan, I don't think you finished answering my question. There are two. Let me rephrase it this way. There are different things in the Brisseno or Brisseno opinion. One is the medical standards that are taken from the medical publications that were current as of the time of that decision. And then there are these additional considerations. And that's what's regarded as the Brisseno factors. But if you — let's take — disregard the latter. The first part are current — are medical standards that were current at that time, are they not? Well, I respectfully disagree, Your Honor, in this respect, because what the Court said in Brisseno was, after talking about following the 1992 standard, it said, we view the medical standards as exceedingly subjective. That's the wording that the Court used in Brisseno. And that's why we're going to come up with these Brisseno factors on our own that are non-clinical. In fact, they're anti-clinical because they're based on these lay stereotypes. And that's exactly what the Court said here as its justification for its prohibition on the use of current medical standards. Its justification, as it says, is 6A to 7A of the petition appendix is the Court's long-standing view about the subjectivity surrounding the medical diagnosis of the intellectual disability, which stands in sharp contrast to what this Court has said in Atkins and in Hall, where in Atkins the clinical definitions were fundamental. As this Court said in Hall, the clinical definitions were a fundamental premise of Hall. And as Hall said, the inquiry has to be informed by the medical community's diagnostic framework. And there's no way that it can be informed by the medical community's diagnostic framework if the — if there's an exclusion and a prohibition on using current medical standards. And, Justice Alito. Ginsburg. I think there's no doubt about what the Texas court said. It's marching orders for Texas courts. It said the habeas judge erred by employing current clinical definition of intellectual disability, disabled, there in that respect, rather than the test we established in Briseno. The test we established in Briseno is thus stated sharply and clearly as the test that must be applied by Texas courts. Is that how you read it? Yes, exactly, Your Honor. It's on page 6A, isn't it? That's right. And I think it is helpful here to consider how Atkins' adjudications — and obviously this is a vitally important life-or-death issue that goes to human — the human dignity of the intellectually disabled and how these adjudications will proceed in Texas after this opinion in light of the passage that Justice Ginsburg just quoted, the critical passage, is that to judges, to lawyers, and to clinical experts testifying in Texas, the message is clear and unmistakable. You may not consult or rely on current clinical guidance. And so think about that from a clinician's perspective, a clinical expert who's been entrusted with evaluating and making this vitally important evaluation of somebody about whether they're intellectually disabled. That person has gotten the clear and unmistakable instruction and will, by the lawyers, you have to go back to the 1992 standard. You can't consider the standards since then. But, Mr. Sloan, I think it's more than that, because it's not just you can't consult the current guidance, you have to go back to the 1992 standards. It says you have to go back to Briseno. And Briseno has these seven factors that are not consistent with the old standards just as they're not consistent with the new standards. Sloan, Jr. That's exactly right, Your Honor. And it's also part of a broader problem and framework interwoven with Briseno itself, where Briseno is setting up a framework where it is saying that only those who are the most severely intellectually disabled are exempt from the death penalty and that it's an open question, it says in Briseno, whether those who are more mildly intellectually disabled or mentally retarded, as they said at the time, are similarly exempt. And this Court in Atkins had just held that there's a bright line exemption for the intellectually disabled. I tried to ask myself if a court could, say, use the Briseno factors first, and after that, if you find no intellectual disability, then turn to the clinical standards. But as Justice Kagan points out, I think there's a conflict. There absolutely is. And it's all rooted, both the conflict with clinical standards generally and the prohibition and the use of current medical standards and the hostility to current medical standards. But it is true that Atkins left some discretion to the States. What is the rule that you propose for how closely the State standards must hew to medical practice? I think it's the rule that the Court announced and explained in Hall, which is that the State must be informed by the medical community's diagnostic framework. And so what I understand that to mean is that, and of course, as the Court said in Atkins and in Hall and Brumfield, the clinical definitions are very, very important. You have to inform it. And if a State wants to conflict with or disagree with the clinical standard, then there has to be a sound reason for doing so. And I think in Hall, this Court identified several considerations. There are four considerations in particular that would go into evaluating whether there's a sound reason for doing so. And the first is, is there genuinely a clinical consensus on that point? The second is, what do other States do on that point? The third is, what does the State do in other intellectual disability contexts? And very tellingly here, Texas uses these Briseno factors and this prohibition on current medical standards only in the death penalty context, in no other intellectual disability context. And as the Court explained in Hall, the condition, as the Court said in Hall, of intellectual disability has applicability far beyond the death penalty. And so when a State does, as Texas is doing here, treats it very differently with much more severe restrictions on finding intellectual disability only in the death penalty, it is at the very least a very major red flag. JUSTICE SOTOMAYOR. Can we go to the practical application of what you're saying for a moment? Let's take the decision of the CCA here, all right? They found two prongs that Mr. Moore had not met. That he couldn't prove that he was clinically intellectually disabled, that his IQ was higher than what was generally recognized clinically. What did they do wrong with respect to that prong? And then secondly, with respect to the adaptive function prong, what did the court below do wrong? Identify the two ways in which what they're doing and how they're applying the standards we're talking about were in error. GOLDSTEIN. I will, Your Honor. And as to both, they are in very sharp conflict with clinical guidance generally and especially with current clinical standards. So beginning with the intellectual deficits and the IQ, the Court of Criminal which, as the Court explained in Hall, with a standard error of measurement, would take it down to 69, well within the range for intellectual disability. But what the Court did here is that it chopped off the lower end of the standard error of measurement. It then treated the 74, the number 74, as decisive and as in and of itself determining that Mr. Moore could not establish an intellectual deficit and he could not establish intellectual disability, which conflicts with clinical standards, current clinical standards in this Court's decision in Hall. The reasons that the Court gives for lopping off the end of the lower end of the standard error of measurement are completely clinically unsupportable. The Court says that he had a history of poor academic performance. Well, of course, that's not inconsistent with an intellectual deficit or with intellectual disability. The Court also says, well, he may have been depressed because he was on death row. Well, there's no death row, there's no rule that if somebody's on death row, you cut off the lower end of the standard error. There's no medical rule to that. That's right. No medical support. There's no medical support. There's no clinical basis for that. And the Court points to what it views as a depressive episode from 2005, which was 16 years after he took the exam in 1989. Sotomayor Well, I thought the most significant part of its alleged error by you in your briefs were that it assumed that things like poverty, poor nutrition, poor performance in school were not attributable to intellectual functioning but to his lack of a good home, essentially. Why is that clinically wrong? Because, Your Honor, so in terms of the causation requirement, which is, I think, what Your Honor is referring to, and there are three major problems with the way the Court dealt with causation. Well, I think the Court's – would you say something about the adaptive behavior? Because I think that may be a stronger leg. Why don't you deal with Justice Sotomayor's question first and then Justice Alito's? Thank you, Your Honor. So in terms of the causation, first, the Court says at page 10A of the Petition Appendix, they ask you to establish that intellectual deficits caused it rather than some other cause, like the causes Your Honor is talking about. And it is well understood as a clinical matter that there is a very high incidence in intellectual disability of multiple causation, comorbidity. So that view of the inquiry is, rather than some other cause, is completely at odds with the clinical understanding to begin with. Secondly, factors that the Court points to include things, in addition to what Your Honor was saying, like, again, poor academic performance, his terrible childhood abuse that he suffered, which not only do not detract from a finding of intellectual disability, they are well recognized as risk factors and associated characteristics of intellectual disability. And third, and very importantly, as the AAIDD explains in its amicus brief, from a clinical perspective, there is absolutely no way to make the kind of showing that the Court requires here about rather than some other cause. As a clinical matter, it's simply impossible to do. And this Court in Hall talked about the risk and the threat that Atkins would be turned into a nullity. And there is no question with that kind of causation requirement that it turns it into a nullity. Now maybe you can respond to Justice Alito. Yes, Your Honor. So in terms of the adaptive deficits, Your Honor, and it's important at the outset to recognize certain points that are undisputed in the record. And it's undisputed, for example, that at the age of 13, Mr. Moore did not understand the days of the week, the months of the year, the seasons, how to tell time, the principle that subtraction is the opposite of addition, standard units of measurement. And there are numerous other deficits like that that are undisputed. But what is the problem with their analysis of that point? So there are four problems, Your Honor. So one of them is that the Court focuses on what it perceives as some strengths which it says outweighs the deficits. Okay. On that one, is there a consensus in the medical community that that's improper? Yes, Your Honor. Well, here's an article written by a number of experts, a recent article from the Journal of American Academy of Psychiatry and the Law assessing adaptive functioning in death penalty cases after Hall and DSM-5. One of these experts was cited in the one of the supporting amicus briefs by professional organizations in Hall, which says that any assessment of adaptive functioning must give sufficient consideration to assets and deficits alike. So what do you make of that? These are just are these quacks? This is Dr. Hogan, Drogan, and Gilmette. Well, Your Honor, the clinical guidance from both the AAIDD and the American Academy of Psychiatry, which comes out about once every 10 years, is very explicit that the adaptive deficit inquiry focuses on deficits and not on strengths, and for two very, very important reasons. And the first is that the clinical inquiry is about the degree to which somebody is impaired in their everyday lives, and so it's focusing on the impairments. And the second reason is that there is a very common stereotype and both of those authoritative sources of clinical guidance emphasize again and again Well, if there are professional organizations by, I suppose, a majority vote or something like that conclude one thing, but there are respected experts who disagree. You're saying the State is obligated. No, I'm not. It's a matter of constitutional law to follow the organization. I'm not saying that, Your Honor. As I said to Justice Kennedy, I think Hall identifies considerations if the case if the court is going to disagree. And the first one I mentioned was, is there a clinical consensus on this point? Can I ask whether you might be talking about two different things? And I might be wrong about this, but as I understand adaptive functioning, there are these particular areas of functioning that have been set out, and what the consensus is is to say, well, if you have deficits in four of these areas, it doesn't matter that you don't have a deficit in another area. And that's what the consensus is. Now, within each area, people, psychologists can look at, you know, within an area to determine whether you have a deficit. Yeah, you have to look at what you can do and what you can't do to decide whether there's a deficit in that area. So the two things might not be in conflict at all. That's exactly right, Your Honor. Or if there's a dispute, for example, about a particular skill. Somebody says he cannot drive. There's proof on the other side that, yes, the person can drive. So there's one question which I don't think you can answer orally, but I think that these cases you can point me to the answer. That's what I want. Look, there will be a bunch of easy cases, and then there are going to be cases like your client, who has been on death row for 36 years. And there will be borderline cases. And the reason they're borderline is because the testing is right at the border. Like an IQ test. And then you'll put weight on what's called related limitations in adaptive functioning, a matter that on its face sounds as if it's maybe easy in some cases and tough in another. All right? What is a court supposed to do? Are we supposed to have all those hearings here? I mean, you've made very good arguments for your client. There are probably several others in the country, in different States, which may have different standards. And if you have some view that the law in this area should be law, i.e., that it should be uniform across the country, point me to something that will tell me how a district judge should go about making this determination in borderline cases. Yes, Your Honor. My suspicion is that there is no such thing. But that's why I asked the question. I want to be sure. There might be. Well, let me make two points, which is that, first of all, Your Honor says, what do courts do? And I do think it's important that the general principle this Court was clear about in Hall, which is being informed by the medical community. I understand what you are saying. Whatever they should do, it shouldn't be what went on here. Okay. I got that point. I'm asking a different point. And if you want my true motive, I don't think there is a way to apply this kind of standard uniformly across the country. And, therefore, there will be disparities and uncertainties and different people treated alike and people who are alike treated differently. Okay? Now, that's my whole story. And I want you to say, no, you're wrong. There is a way to do it. What? Well, Your Honor, I think, actually, the best places to look on this would be the AAIDD current manual, the 11th edition, as well as the pages in the DSM-5 that address it. And it actually points up an important difference in the current standards, because for the first time, the 11th edition, because of this problem about stereotypes that if people have strengths, they can't be considered intellectually disabled, for the first time, the current 11th edition, the very one that the court said was off limits here, has an entirely new chapter, chapter 12, about the issues and problems of people who have high IQ, who are intellectually disabled, but they have high IQ, and exactly the group of people that Your Honor is talking about. And the user's guide accompanying that manual, for the first time, has a list of harmful stereotypes, which includes exactly that. And the other thing, Your Honor, though, that I do have to emphasize is that whatever one thinks about the application across the country, there is no question that Texas is very extreme and stands alone in its view of basically disagreeing with the core premise of Atkins. And repeatedly in its decisions, drawing distinctions between those who are severely mentally retarded in many of the decisions and those who are mildly, and saying that there is no bright line exemption for those who are mildly. And also, in Briseno itself, the court said, the Court of Criminal Appeals said, our task is to decide what a consensus of Texas citizens thinks the line should  be. And of course, this Court in Atkins had just decided, for Eighth Amendment purposes, the consensus of United States citizens. Your Honor, I'd like to reserve the balance of my time. Roberts. Thank you, counsel. General Keller. Keller. Thank you, Mr. Chief Justice, and may it please the Court. Petitioner conceded that we could have used the DSM-IV instead of the current DSM-V. That answers the question presented. And Petitioner, in their reply brief, says there is no material difference between the language in Texas's standard, which is based on the AMMR Ninth Clinical Framework, and current clinical frameworks. So essentially, this case has shifted to a discussion of the seven Briseno evidentiary factors. And if I can put those into context, the seven Briseno factors are all grounded in this Court's precedence, as we point out in our bullet point list at pages 53 to 55 of our brief. What those go to are the second prong of the clinical definition, the adaptive deficits inquiry. All of those questions are asking, can someone function in the world? And that's precisely what the Pennsylvania Supreme Court noted when it also endorsed the Briseno factors. Ginsburg. You describe these as coming from some source, but Briseno itself listed this in seven, was it, bullet points, did not give a single citation for where anyone came from. It did. However, this Court, in pages 53 to 55 of our brief, we go factor by factor and quote this Court's precedence to show how they're congruent with factors that this Court itself has considered. And also, at Petition Appendix 162A, the trial court adopted Petitioner's proposed conclusions of law. And that said that analyzing the facts under that second prong, that adaptive deficit prong, even under the current AIDD 11th, quote, answered many of the Briseno factors, unquote. So the analysis that's done under the second prong of the clinical framework, the adaptive deficits prong, that is going to overlap with these Briseno factors. And so this is not a free-floating test that negates or obviates the three-prong established test that Texas uses and that is part of the national consensus. Kagan. Would you agree with this, that the Texas Court of Criminal Appeals in Briseno and in other places has made clear its view that the Texas can choose to execute people whom a complete consensus, a 100 percent consensus of clinicians would find to be intellectually disabled? Would you agree with that? I don't believe that's what the Briseno opinion said. What the Briseno opinion said was it was going to adopt clinical standards. I'm asking about Briseno and other court of appeals decisions, and I thought that you said this in your brief, that the – that your view of the point of State discretion is that a person who everybody – every clinician would find to be intellectually disabled, the State does not have to find to be intellectually disabled because a consensus of Texas citizens would not find that person to be intellectually disabled. Isn't that the premise of the court of appeals decisions? No. Quite the contrary. Let me very clearly state about the Texas consensus language in the opinion. The Briseno opinion flags the issue about would a Texas consensus materialize on an issue. But the court then twice said it was not going to answer that question. It was not going to do that. That was for the legislature. And instead what the court did was that it adopted the AMMR 9th's clinical standards in the Texas Health Safety Code definition. Well, I guess I just don't understand this, and I really don't understand it in light of your brief, which I'm going to start to quote from pretty soon. But what the – it seems to me what the Texas court did is to say, look, we're going to accept the three dimensions, the adaptive deficits and the IQ and the age, but with respect to the quality and the degree of impairment, I think that that's their language, we're not going to accept the clinician's view so that people with mild impairment can be executed, even though the clinicians would find those people to be intellectually disabled. Briseno very clearly adopted the three-prong established test. In cases since then that we've cited throughout a brief also applies that. Kagan. Kagan. The question is the degree of impairment as to each of these – those prongs. And, again, it seems to me pretty clear from your brief, when you're talking about Atkins didn't establish a national standard, that you're saying, too, that the Texas – and if you're not, I mean, I guess I'm surprised by that, that you're saying that the Texas courts do need to follow clinical assessments of intellectual impairment, because that's – it's just not what you say on page 19 and 20 and 21 of your brief. Justice Kagan, it's true this Court has recognized there is a difference between a legal determination regarding Eighth Amendment culpability and a medical diagnosis. But Briseno adopted the clinical standards in the AMMR-9. I'm sorry. Go back to Justice Kagan's question. Well, he was talking about my question, so go on. Thank you, Justice Kagan. Also, even the DSM-5 itself, the current framework that Petitioner points to, says there is an imperfect fit between those two concepts, and this Court has cited that exact language in previous DSM versions for that same proposition. And so, no, it is not the case that States have to categorically wholesale adopt the positions of current medical organizations. But what Briseno itself actually did was, in fact, adopt the AMMR-9, the precursor to the AIDD-11. And Petitioner's reply brief now says there is really no material difference between the Eleventh and the Ninth language. And that's why we're not talking about the three-pronged test, the facial text of the language. We're talking about the Briseno factors. I have a follow-up, unless you want to go, Justice Sotomayor. Go ahead, and then I'll follow up. Well, maybe I could add a follow-up. Justice Kagan, please. Maybe I can. Let me just take one of the Briseno factors, right? And it's the idea that what laypeople think about the person growing up is relevant to an assessment of adaptive function. Now, no clinician would ever say that. The clinicians say, no, that's sort of like stereotypical layperson view of adaptive functioning, which is different from the clinical view of adaptive functioning. But the Briseno factors make very clear sort of point one, that you're supposed to sort of, that you're supposed to rely on what the neighbor said and what the teacher with So that seems to me a very big difference between the Briseno factors and the clinical view of intellectual disability. This Court in Hall looked at what siblings and teachers from the developmental period also did. And clinicians would also look to those. In fact, here, there was testimony at the penalty phase retrial about people, lay witnesses, that knew Petitioner at the time. So it's not that this is irrelevant evidence. It's not probative. Now, it's not going to be necessarily dispositive. That's going to depend on the totality of the circumstances. And the record on adaptive deficits. But this is absolutely probative evidence of whether someone can function at all. Kagan. Well, but Briseno says essentially that this can trump everything. And it says that this can trump everything because of the underlying view of Briseno and other Texas court of appeals cases, that we don't have to look at the clinical standards and that we can execute people whom clinicians would find to be disabled. No. Briseno did not say that the seven evidentiary factors can trump the established three-prong definition that Texas has consistently applied. Kagan. I'm sorry, Mr. General Collier, because you keep on saying the three-prong definition, but the three-prong definition just tells you you have to look to IQ, you have to look to adaptive functioning, you have to look to youth. It doesn't tell you anything about what qualities you look to and the extent of impairment within those factors. And that's where the Texas court has insisted upon its freedom to go out on its own. Sotomayor. Sotomayor, may I note that, as a footnote only, you can continue, that in Ex Parte Sosa, the CCA sent back a case directing the lower court to apply the Briseno factors, even though that court had analyzed the case under the clinical standards. It appears to be acting as if those Briseno factors are the clinical factors and are controlling, even though there are stereotypes built into them. They are not stereotypes built into them. The standards are not. Well, the DMA and all the other clinicians recognize that some mentally disabled people can have some adaptive functioning, idiot savants, for example. Is it your position that if someone can calculate math in their head, they can't be intellectually disabled? No. The point of the Briseno lawsuit is that if that same person has a job in NASA calculating the airspace shuttle launches, is that person not intellectually disabled simply because they can use that particular skill in a way that gains them employment? No. And as what Texas standard says is it looks to actually the current frameworks and says for adaptive deficits, you look at conceptual, social, and practical skills. But if I can address SOSA, the CCA there reversed the trial court because what the trial court held was that it categorically was prohibited from looking at the facts of the crime. It didn't say you had to use the Briseno factors. It said the court was not going to use the Briseno factors. Alito, we're not reviewing SOSA. Could I ask a question about what the court did in this case? Now, on pages 62a and 63a of the petition, the appendix to the petition, it sets out the three factors, and then it discusses those at length. And then on page 89, it says, In addition, our consideration of the Briseno evidentiary factors weighs heavily against the findings. So is it clear that these evidentiary factors actually played an indispensable role in the decision in this case, which is what we're reviewing? No, they did not. They were only two pages to bolster a second alternative holding on relatedness. And that weighs heavily language? That is only talking about weighs heavily on the relatedness inquiry. The court had already concluded in pages of its analysis that there was sufficient intellectual functioning under the first prong, and there were sufficient adaptive deficits. Compton's testimony said, I do not have the deficits to find a diagnosis, and that was even before prison. That is a sufficient basis to affirm, without getting into the relatedness inquiry or getting into the Briseno factors. Kennedy, are you saying that the Briseno factors capture all individuals with intellectual disability? No. The Briseno factors, there could be other circumstances or other facts in the record that would bear on the adaptive deficits prong, and that's why the CCA said these are discretionary. These are different ways of phrasing how you do the conceptual, social, and practical factors. Isn't making it discretionary a huge problem in this area? Because if you let one trial court judge apply them, and another one doesn't have to apply them, then you're opening the door to inconsistent results, depending upon who is sitting on the trial court bench, something that we try to prevent from happening in capital cases. No, Justice Ginsburg. When it's discretionary, what the CCA said, and this is the Cathy case, it says the trial and appellate courts may ignore some or all of them if they are not helpful in a particular case. In other words, this is just looking at the record. Is there evidence on any of these factors? If there's not, that's not going to be a helpful factor in that case. And, Justice Kennedy, as far as the universe of people that would be or would not be covered by the Briseno factors, the CCA has used the Briseno factors to grant Atkins relief. That's the Van Alstyne case. And they've also affirmed trial court decisions. This is Valdez, Bell, Plata, and Maldonado at page 34. Kennedy, but the theme is, of the Petitioner's brief, that the Briseno factors are intended to really limit the classification of those persons with intellectual disability as defined by an almost uniform medical consensus. And the CCA has never said that the purpose of these factors is to screen out individuals and deny them relief. But isn't that the effect? No. Van Alstyne granted relief by looking at the Briseno factors. The four cases I just mentioned, these are cited at page 34 and 22. Kennedy, of course. Kennedy, General, there are going to be cases in which the Briseno factors will show that it's disabled, but that's not the question. The question is, can they be an exhaustive list? The Briseno factors are not an exhaustive list, and the CCA has never treated them like that. Kagan. Kagan. The genesis of these factors was that the court said the clinical standards are just too subjective, and they don't reflect what Texas citizens think, both of those things. They are too subjective and they just reflect what clinicians think. They don't reflect what Texas citizens think. That was the genesis of the standards, which suggests that Justice Kennedy is right about how they operate and also how they were intended to operate. The Court did mention subjectivity. The Texas consensus point, though, was not part of the basis to do that. What the CCA was really trying to do here was take the adaptive deficit prong, which is phrased in the terms of related and significant limitations in adaptive functioning, and put that into more concrete terms where you could apply it to a record. Now, basically what you're saying is that there are two things wrong, possibly, with the factors, which we've heard. One, I can't deal with at this moment in oral argument. You could go through them, they're in the briefs, one by one, and say, reading them, actually they're not consistent with or they reflect an error when compared with what the psychiatrists and psychologists think. Your answer is they don't, the other side says they do. I can't go further with that here. The other is the question of why did the Texas court write these standards? Now, I have to admit that in reading through Bristnow, I came to a, at least, pause when I read the words that they're trying to figure out what to do in borderline cases, and what they've done is not, you know, I understand it, but they say, we have to figure out the level at which a consensus of Texas citizens would agree that a person should be exempted from the death penalty. When I read that, and when I read there's some other words, that's on page 6 of the report, of the reported opinion. When I read some other things that they said, I thought, well, they're trying to do this, which we do often in law. What's the purpose of this? The whole purpose is to try to figure out whom not to execute because of their functioning, the way they function. That's the purpose. Let's look at what Texas citizens would think about this person, and let's try to get standards that reflect that. I really did think that's what they were trying to do in that opinion. And they're arguing that that's the wrong thing to try to do in this instance. First, because it would produce non-uniformity among 50 States or among the many States that have the death penalty. Second, because the question is not what the citizens of the State think about who should be executed. That has nothing to do with it. Oddly enough, in this case, what has to do with it is a technical matter about this individual that would free some, while subjecting others, to the death penalty irrespective of what Texas citizens think. So do you see my question? What were they up to in this opinion? Brisno, I think they were up to, going back to the citizens of Texas, you saw what I think they're up to. Now, you tell me if I'm right, wrong, or why. Bursano, I believe that's mistaken because there are two points after that discussion of Texas consensus where the Court says, and this is page 6 of Briseno, as a court dealing with individual cases and litigants, we declined to answer that normative question about the Texas consensus without the significant greater assistance from the citizen reacting through its legislature. And then two pages later, it's again assessing the difference between a legal determination and a medical diagnosis, and the Court says that definitional question is not before us in this case because it goes on to adopt the AMR 9th clinical standards. Sotomayor, Mr. General, going, just, is it your view that what Texas is trying to do is determine who's truly on the clinical borderline as opposed to trying to determine the type of mentally disabled people that it thinks should be executed? Correct. Aren't the latter? Yes. Texas has adopted clinical definitions in the AMR 9th. All right. So what, is it fair to say that in Texas, a mildly disabled person is unlikely to be considered disabled by the CCA under the Briseno factors? No. If there was a diagnosis of intellectual disability, even mild intellectual disability, that would satisfy the three-percent test. But you point to one of the cases that you've cited to me where someone was clinically diagnosed as mildly disabled and the CCA said under the Briseno factors that they should not be executed. A lot of the cases that you provided me with, there was clinical evidence of moderate and mostly severe, but moderate to severe disability. But was there anyone with mild disability that the Briseno factors would find sufficiently disabled? Justice Sotomayor, the Van Alstyne case is the case that I can point to where the CCA looked at the Briseno factors and granted relief. But if I can pull back out the question of the question. Did they find him mildly disabled? The testimony there was on adaptive deficits, and I believe the mild, whether it's mild or moderate, would go more towards IQ scores. If I can pull back out, the question presented here is whether Texas has prohibited the current standards from being used and is erring by using an outdated standard. Petitioners conceded we could have used an older version, and Texas is not prohibiting the use of current standards. In this case, the CCA repeatedly quoted and cited. Sotomayor, so why did it go through so much trouble in saying that it wasn't going to use current standards, that it was only going to use the older standards and the Briseno factors? Because the current standard used by the AIDD 11th does not have the relatedness inquiry. And now, that is an extraneous part of this case. It was a second alternative holding. But that was the main reason why the CCA said, trial court, you're not following our precedents.  Sotomayor, if you believe that its definition of relatedness has no support anywhere, would that have been a valid reason for discounting the current clinical standards? Well, that was a second alternative holding here. It's facially valid for Texas and any other State to have a relatedness requirement. That's in the DSM-5. The DSM-5 talks about needing something to be directly related, but it doesn't really flesh that out. So what we'll be talking about is the application of that. And this would be an odd case to decide that issue when it's a second alternative holding. There's no State consensus on this causation point. That's the Coleman case from the Tennessee Supreme Court cited in the reply brief. We are not aware of any case in which the relatedness inquiry was the dispositive point on which an Atkins claim was denied. Well, I'm not sure how I can accept your characterization of the CCA decision when basically it's saying his poor intellectual functioning on IQ tests, which happened when he was younger, were not related to his intellectual abilities. They were related to his poverty, his morbidity factors. If they're saying that, how are you saying they weren't finding that he wasn't having those other factors? That's how I read their decision. But it wasn't just the CCA saying that. It was relying on testimony. Here, Petitioner argued that Well, wait a minute. The testimony of Compton was, having looked at all of the IQ tests, was I'm not sure. It's probable that he's intellectually disabled by IQ, but he wouldn't qualify in my judgment because of his adaptive skills. But even the State's own expert said that it was probable that he was intellectually disabled. The State's expert said that it would have been borderline on intellectual functioning. But the CCA on relatedness, and again, this is a second alternative holding that the Court doesn't have to reach, it looked at testimony from Petitioner's retrial in 2001 when Petitioner affirmatively argued that he was not intellectually disabled, and the expert there, that was Petitioner's own expert, agreed. Ginsburg. There was a strategic advantage to doing that back in those days, right? Well, actually, at the time, Penry would have been decided, and there would have been a valid basis to say, Petitioner, I'm intellectually disabled, therefore use that as mitigation evidence. The strategy, which was a reasonable strategy from counsel, was to say that Petitioner would be able to grow in prison, and therefore that was mitigation evidence that he could be reformed. But Wright, the Petitioner expert, agreed with the prosecutor that Petitioner was, quote, nowhere near, unquote, intellectually disabled, and said a lack of education was to blame. That's at Joint Appendix 269. Sotomayor. Well, that happened in Atkins, too. Regrettably, until we decided that mental disability was a ground to excuse execution, many mentally disabled defendants were represented by counsel who thought that mental disability was a ground to excuse execution, and therefore that arguing differently was a better strategy. Of course, Penry would have been on the books, and so there would have been an advantage to argue that, and that's why that's a contradicting argument. Regardless, even if that's not controlling, though, here, the CCA credited Compton's testimony as the most reliable expert, who's the only forensic psychologist who thoroughly reviewed the records and personally evaluated Petitioner for intellectual disability, and Compton said, I don't have the deficits for a diagnosis. But this is a fact-bound question of the application of the test. The question presented here is whether Texas's well-established three-pronged test for intellectual disability violates the Eighth Amendment, and Texas is well within the national consensus. There are only four states that have categorically wholesale adopted one of the current frameworks. Two of them did so, saying there's no material difference in the language between the current framework and that test, and that's the precise position that Petitioner has taken in the reply brief. Ginsburg. Can you explain why Texas applies a different test to determine whether a school child is intellectually disabled or a juvenile offender, to determine what to do with that offender? Texas applies a different test, one compatible with current medical standards, in both of those categories. Why does it have a different standard for capital cases only? So, first of all, the juvenile offender discharge rule that Petitioner cites at page 7 of the reply brief, that actually adopts the three-pronged test that Briseno adopted. That's 37 Texas Administrative Code 380.8779C1. Now, there are other provisions that incorporate by reference the latest manual of the DSM. But as the DSM-5 itself noted, there's an imperfect fit between a determination of legal – a legal determination of culpability for Eighth Amendment purposes and a medical diagnosis. And since you have those different purposes, it is valid for a State to have a different definition of when someone is morally culpable under the Eighth Amendment versus when someone should be able to get social services benefits. Breyer. That's exactly the point. That's the point that we've been making, or at least I thought we were, that the whole point of Briseno is really to answer the question that you said prior to say, no, it isn't really there. It's to help determine which persons suffering borderline cases of mental disability ought to be executed or should not be because they are less morally culpable. Now, I did think that's what they said. That does supply a reason for making differences, as Justice Ginsburg just pointed out. And then the question is, is it what the purpose of Atkins and the other case, Hall, was? Was it to give each State the right to decide in borderline cases whom or whom not to execute in light of their feelings about capital punishment? I thought it had a different purpose, unusual in the law, but which was to appeal to technical definitions of who and who is not mentally retarded or intellectually disabled. That's a real issue. But I think that this case does present that issue. And what Atkins and Hall said was there's a critical role for the States. And while States don't have unfettered discretion, they do have some discretion. And every time the DSM-5 or the next edition of the AIDD-11th comes or the 12th comes out, the States don't have to automatically wholesale adopt that, because there is a well-established three-pronged test. This test has existed for 50 years. And the States, there's a national consensus adopting that test. There's not a national consensus against the relatedness inquiries causation. There's not a national consensus that the various factors of the Brisegno factor of an injury test can't be applied. And on adaptive strengths in particular, no State prohibits the use of adaptive strengths. In fact, three of the States that use the current frameworks, that have adopted wholesale the current frameworks, still look at adaptive strengths. The Hackett case from Pennsylvania is the best example of that. Sotomayor, Well, the problem is that as I read the CCA opinion, it's looking at adaptive strengths only and not at adaptive deficits, and looking at the depth of them or how they form the intellectual disability component. Even Dr. Compton, the State's expert, testified that Mr. Moore could not, from memory, recreate a clock. Now, she says, I don't quite believe that. But she doesn't quite believe that of a person who at 13's father threw him out because he was dumb and illiterate. Couldn't tell the days of the week. Couldn't tell the months of the year. Couldn't tell time. Couldn't do anything that one would consider within an average or even a low average of intellectual functioning. Who's eating out of garbage cans repeatedly and getting sick after each time he did it, but not learning from his mistakes. The State's opinion does very little except say, those are products of his poor environment. They're not products of his intellectual disability. No. Compton's testimony was she did not have the adaptive deficits. In addition to analyzing, and she said, you know, there are limitations, I see, whether it's academic abilities or social skills, but there have to be significant limitations. And she said that wasn't there. She noted Petitioner testified four different times in the course of these proceedings, even in a Ferretti hearing, in filing pro se motions, and was responsive to questions and was understanding what was going on. He lived on the streets. After the crime, he absconded to Louisiana. Sotomayor, who the pristino factors were fashioned after, Lenny was working on a farm. How is that different from mowing a lawn? And the State had no problem in saying that Lenny, even though he could work, earn a living, plan his trying to hide the death of the rabbit he killed, that he could do all of those things, and yet he was not just mildly, but severely disabled. Why is the fact that he could mow lawns and play pool indicative of a strength that overcomes all the other deficits? Lenny, in the character form of Meissenman, was never part of the test. It's not part of the test. It was an aside in the opinion, and the Court said it was not going to address that separate question and instead adopted the clinical standards. Sotomayor, but it informed its view of how to judge the lack or strength of adaptive functions. It used the Lenny standard. No. It absolutely did not. And we can see that, not only from the fact that what happened in Briseño was the Lenny paragraph was an aside, and then the Court adopted the clinical standards. The CCA has only once since then ever cited Lenny, and it was in a footnote quoting a trial court, and the CCA granted Atkins relief in that case. The Lenny standard has never been part of a standard, and that's one of the most misunderstood aspects of the briefing here. Kagan, I'm sort of trying to reconcile the various statements you've made here and in your briefs, and here's what I've come up with, and tell me whether it's right. I think what you're saying is that the Texas Court of Appeals is complying with Atkins because it uses a three-pronged test, focusing on IQ and adaptive function and age, but within each of those prongs, in order to make this distinction between clinical disability and moral culpability, within each of those prongs, the court can choose how to apply that prong and particularly what levels of impairment to use. Is that a fair assessment? Mr. Chief Justice, may I answer? I don't believe so, Justice Kagan, because what the court has done is it has adopted the clinical prongs, it has adopted the three-part test. Kagan. And yes, it's adopted the three-part test, but within each of those prongs, you get to apply it. I thought that that was the entire point of Hall. No, that's wrong. You don't get to apply it however you want. But on intellectual functioning, Texas has never had an IQ cutoff. As Hall recognized, it applied the error of measurement. And even on the adaptive prong analysis, that is going to account for conceptual, social, and practical skills, as Texas has actually adopted the current standards. Thank you, counsel. Three minutes, Mr. Sloan. Thank you, Your Honor. Just a few brief points. First, there was a lot of discussion about the role of Briseno in the relationship to clinical standards in the Texas Court of Criminal Appeals decisions. And I would suggest that the Court look at the American Bar Association amicus brief, because it goes through three decisions of the Court of Criminal Appeals, where in each of those three decisions, the clinical testimony, the expert testimony, was unanimous that the individual was intellectually disabled. And the Texas courts used the Briseno factors to conclude that, in fact, he was eligible for execution, notwithstanding the unanimity of that expert testimony. Second, my friend said that I conceded that they could have just applied the DSM-IV and rejected the DSM-V. Just to be clear, and just for the record, I did not concede that. And in my response to Justice Kennedy, I was saying that if a state is going to reject a clinical consensus and the current clinical standard, as in that example, then there would be a number of factors that the court would look at. And one I didn't get to was, and very importantly, is the Eighth Amendment principles and concerns that this court outlined in Hall and in Atkins. And the absolute requirement to ensure that somebody who's intellectually disabled is not going to be executed. Third, one point about Chief Justice's initial question that I never quite got to about the question presented. In addition to the fact that, as we did discuss, it's interwoven with the Briseno decision. In the cert papers themselves, in our cert petition and our reply, we repeatedly used the phrases like non-clinical, unscientific, standards completely untethered to clinical consensus. And indeed, the state in its opposition to the cert petition rested heavily on the Briseno factors. There's a few pages of their opposition that are specifically directed to that. So that was very extensively discussed in the cert papers at the time. Could you just clarify what you said about DSM-IV and DSM-V? Because I had a different impression from your initial argument. So if we were to say today, every state must adopt DSM-V. And then at some point in the future, DSM-VI comes out. Would it be your position that those states would all have to go back and reconsider what they're doing? They would have to consider them as part of the diagnostic framework. And again, these new additions come out about once every ten years. But yes, Your Honor, because those additions represent the scientific method at work. People using their best clinical and medical training to refine and to sharpen the tools. And with regard to intellectual disability, to identify the people- Is it your view that Briseno factors are all consistent with DSM-IV? No, Your Honor. They are completely inconsistent with clinical factors. And they have been from the day that they were announced. But it is even more clear that they are inconsistent with clinical factors in light of the current clinical standards. And my friend also was suggesting that there's some question about, based on Briseno. May I finish this sentence, Your Honor? Based on Briseno, about whether, in fact, there is a bright line exemption for the intellectually disabled. He was suggesting that it's clear there is. And I just briefly wanted to call the court's attention to what the Court of Criminal Appeals has said, relying on Briseno. In ex parte Hearn, the court said, and I quote, this court has expressly declined to establish a mental retardation bright line exemption from execution without significantly greater assistance from the legislature. Briseno, 135 Southwest 3rd at 6. And similarly, in ex parte Sosa, the court said, answering questions about whether the defendant is mentally retarded for particular clinical purposes is instructive, but not conclusive. Thank you, Your Honor. Thank you, Counsel. The case is submitted.